UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
ELAVON, INC.,

                          Plaintiff,

                    v.

SILVERTOWN OF NY INC., ESTER
WERZBERGER, CHAN FRIEDMAN, JOHN
DOES 1–10, and ABC COMPANIES 1–10,

                         Defendants.
---------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-908 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Elavon Inc., commenced the above-captioned action on February 20, 2020, against Defendants Silvertown of NY Inc. ("Silvertown"), Ester Werzberger, Chan Friedman, John Does 1–10 ("John Does"), and ABC Companies 1–10 ("ABC Defendants"), alleging breach of contract, breach of guaranty, fraud, unjust enrichment, and violations of New York Business Corporation Law § 1006(b) ("N.Y. BCL § 1006(b)"). (Compl., Docket Entry No. 1.) On August 28, 2020, Defendants moved to compel arbitration, (Defs.' Mot. to Compel Arbitration ("Defs.' Mot."), Docket Entry No. 29; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 29-1; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 30), and Plaintiff opposed, (Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 31).

      For the reasons explained below, the Court grants Defendants' motion to compel arbitration.

**I.   Background**

Plaintiff is a wholly-owned subsidiary of U.S. Bank National Association.[1]  Silvertown is a dissolved corporation that sold and manufactured silver goods in Brooklyn, New York.[2] (Compl. ¶ 4.)  According to New York State records, Friedman is the Chief Executive Officer ("CEO") of Silvertown and resides in the state of New York.  (*Id.* ¶¶ 7–8.)  Werzberger owns one hundred percent of Silvertown and resides in the state of New Jersey.  (*Id.* ¶¶ 9–10.)  The true names of the individuals defined as John Does and entities defined as ABC Companies (collectively, the "Sham Customers") are currently unknown to Plaintiff.  (*Id.* ¶¶ 12–13, 52.)

On July 22, 2010, Silvertown signed a written contract with Plaintiff, which incorporated by reference a Terms of Service and a Merchant Operating Guide (the "Contract").  (*Id.* ¶ 18.) Pursuant to the Contract, Plaintiff "fully performed, or was excused from performing" its role as Silvertown's credit card processor — which enabled Silvertown to accept credit card payments from VISA, MasterCard, American Express, and Discover, (*id.* ¶¶ 19–21) — and in return, Silvertown was obliged to reimburse Plaintiff for customer chargebacks,[3] (*id.* ¶ 22).  The Contract included a material provision where Werzberger guaranteed personal payment of any

---

[1] The Court assumes the truth of the factual allegations in the Complaint for purposes of this Memorandum and Order.

[2] Prior to its dissolution by the State of New York on or about October 26, 2016, (Compl. ¶ 5), Silvertown "shipped and received products traveling in interstate and/or foreign commerce and accepted credit cards issued by out-of-state and national banks," (*id.* ¶ 6).

[3] A chargeback, also known as a credit card dispute, "is a reversal of a transaction between a merchant and a customer credit cardholder.  Chargebacks typically occur because of a customer's dissatisfaction with the goods or services provided by a merchant." (*Id.* ¶ 23.)  A substantiated "chargeback results in a credit card processor . . . reimbursing the customer's credit card-issuing bank the amount of a disputed transaction.  The card-issuing bank will then post a credit to the cardholder's balance." (*Id.* ¶ 24.)

sums due and owing by Silvertown to Plaintiff on account of the Contract (the "Guaranty"). (*Id.* ¶ 32.)

As a result of publicly available regulations[4] set by VISA, MasterCard, and American Express — which Silvertown was familiar with, (*id.* ¶ 27) — Plaintiff was required to reimburse cardholders and card-issuing banks with "the amount of the presented chargebacks regardless of whether Silvertown maintained sufficient reserves for [Plaintiff] to recoup for itself the amount of the refunds and regardless of whether or not the card issuing bank and the cardholder were ultimately successful in the presentation of the disputed transaction," (*id.* ¶ 26).

Between August of 2015 and September of 2016, Silvertown had numerous chargebacks, which resulted in Plaintiff reimbursing card-issuing banks nearly $1 million on Silvertown's behalf. (*Id.* ¶ 28.) Plaintiff demanded that Silvertown repay the amount of $1,024,041.02, (*id.* ¶ 29), which Silvertown has not paid, (*id.* ¶ 30). Plaintiff now seeks the amount owed "together with interest thereon at the legal rate from the date of breach," (*id.* ¶¶ 30, 33), and costs and attorneys' fees from both Silvertown and Werzberger, (*id.* ¶¶ 31, 34).

Plaintiff alleges that Silvertown engaged in a fraudulent scheme to present Plaintiff with sham transactions for pecuniary gain. (*Id.* at 6.) Silvertown's July 22, 2010 application to

---

[4] "The [r]egulations state that a credit card holder must initiate a chargeback by contacting his or her credit card[-]issuing bank and affirming [nonreceipt] of the promised goods or services." (*Id.* ¶ 53.) Following a customer dispute, the credit card-issuing bank "transmit[s] the chargeback statement using either the Visa, MasterCard or American Express electronic communications system, as appropriate, to the merchant's credit card processor, which transmits it to the merchant for validation and response." (*Id.* ¶ 54.) Thereafter, "the burden shifts to the merchant either to accept the chargeback or provide facts showing that the credit card holder did receive the goods and/or services paid for." (*Id.*) "In the event that the merchant accepts the chargeback or its defense to the credit card holder's dispute is found to be insufficient, the chargeback will be confirmed, and the amount of the disputed transaction will be deducted from the credit card processor." (*Id.* ¶ 55.) The "credit card processor bears pecuniary responsibility for the chargeback amount even if the amount exceeds the balance of a merchant's account with the credit card processor." (*Id.*)

3

Plaintiff stated that their expected monthly credit card sales were to be approximately $25,000. (*Id.* ¶ 35.) Beginning in November of 2012, "Silvertown's credit card sales began to increase significantly," (*id.* ¶ 36), an increase that Plaintiff ascribes as "fraudulent . . . [because] Silvertown did not agree to provide any goods or services to [Sham Customers] presenting their credit cards to Silvertown for payment, and the [Sham Customers] did not expect Silvertown to provide them with any goods or services," (the "Sham Transactions"), (*id.* ¶ 37). "With the exception of two months, Silvertown's credit card sales volume exceeded $100,000 during every month between November [of] 2012 and July [of] 2015." (*Id.* ¶ 36.)

Plaintiff also alleges that Silvertown was "aware that the Sham Customers were providing their credit cards to Silvertown to participate in the Sham Transactions," (*id.* ¶ 40), and the individuals involved were "aware of each other's respective identities and roles in the scheme, including the requirement of a constant stream of funds derived from Sham Transactions necessary to maintain the scheme," (*id.* ¶ 45). As a result of the Sham Transactions, Silvertown "periodically transferred funds to the Sham Customers to reimburse them" and enable them to pay down debt owed to their credit card-issuing banks. (*Id.* ¶¶ 42–43). Communicating via mail and/or interstate wire, (*id.* ¶ 49), Silvertown "informed the Sham Customers, and in particular . . . [John Does] and . . . ABC Defendants, of the [r]egulations," and explained that in the event Silvertown was "unable to provide funds to them sufficient to pay down the debt they incurred through the Sham Transactions, they could initiate chargebacks and the [r]egulations required [Plaintiff] to reimburse them," (*id.* ¶ 47).

"Beginning on or about August 3, 2015 and continuing through September 21, 2016, Silvertown's account with [Plaintiff] became the subject of approximately [ninety-five] chargebacks of various amounts" (the "Subject Chargebacks"), (*id.* ¶ 50), which were predicated

4

on Sham Transactions, (*id.* ¶ 51). To compensate themselves, (*id.* ¶ 59), the Sham Customers requested that their credit card-issuing banks initiate Subject Chargebacks on the false premise that "Silvertown had failed to provide the goods or services purchased in Sham Transactions," (*id.* ¶¶ 56–57). The credit card-issuing banks forwarded the Subject Chargebacks to Plaintiff and Plaintiff requested that Silvertown respond to the chargebacks. (*Id.* ¶ 61.) Despite Silvertown's failure to respond, (*id.* ¶ 62), Plaintiff reimbursed the Sham Customers with the amounts of the Subject Chargebacks, (*id.* ¶ 63).

Plaintiff alleges breach of contract against Silvertown, breach of guaranty against Werzberger, violations of N.Y. BCL § 1006(b) against Werzberger, Friedman, and John Does, and unjust enrichment against Defendants, and seeks compensatory damages, attorneys' fees, and interests and costs. (*Id.* ¶¶ 64–76, 86–89.) Plaintiff also alleges fraud against John Does and ABC Defendants and seeks compensatory and punitive damages. (*Id.* ¶¶ 77–85.)

## II. Discussion

### a. Standard of review

The Federal Arbitration Act (the "FAA") requires courts to compel arbitration of claims that the parties have agreed to arbitrate. *See AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Courts consider four factors in order to determine whether an action should be dismissed in favor of arbitration: "(1) whether the parties agreed to arbitrate; (2) the scope [of] the arbitration agreement; (3) whether, if federal statutory claims are asserted, Congress intended those claims to be nonarbitrable; and (4) whether, if some but not all of the claims in the case are arbitrable, the case should be stayed pending arbitration." *McAllister v. Conn. Renaissance Inc.*, 496 F. App'x 104, 106 (2d Cir. 2012) (citing *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)); *see also Garcia v. Golden Abacus Inc.*, No. 16-CV-6252, 2017 WL

2560007, at *2 (S.D.N.Y. June 13, 2017) (same).

Generally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 481 (2d Cir. 2011) (quoting same). When an agreement is clear, "it is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (explaining that "[t]he threshold question of whether the parties . . . agreed to arbitrate is determined by state contract law principles" (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 (2d Cir. 2002))). An employee's right to pursue statutory claims may only be waived by a Collective Bargaining Agreement (CBA) if that waiver is "clear[] and unmistakable[]." *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 274 (2009); *see also Lawrence v. Sol G. Atlas Realty Co., Inc.*, 841 F.3d 81, 83–84 (2d Cir. 2016) (refusing to compel arbitration where the CBA did not clearly encompass the plaintiffs' statutory claims).

In deciding a motion to compel arbitration, courts apply a similar standard to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non[]moving party." *Nicosia*, 834 F.3d at 229. The party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)). In addition, "[a] district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" *Nicosia*, 834 F.3d at 229 (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 345

6

(2d Cir. 2015) ("[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested.").

### b. The Contract is subject to arbitration between Plaintiff, Werzberger, and Silvertown

Defendants argue that the claims against Werzberger and Friedman are subject to arbitration "because of equitable estoppel and because of their role as agents of Silvertown." (Defs.' Mem. 6.) In the alternative, Defendants contend that "the Guaranty contains an arbitration provision," and even if it did not, "Plaintiff's claim for breach of the Guaranty would still be arbitrable because it 'makes reference to and presumes the existence of' the obligation in the credit[]card-processing agreement and 'depends entirely upon [Silvertown's] contractual obligation to pay' Plaintiff for the chargebacks." (Defs.' Reply 4 (quoting *Autonation Fin. Servs. Corp. v. Arain*, 264 Ga. App. 755, 761 (2003).) Defendants assert, and Plaintiff agrees, that Georgia state law governs the resolution of this motion.[5]  (Defs.' Mem. 4–6; Pl.'s Opp'n 4.)

Plaintiff contends that the "Guaranty does not contain an arbitration provision, and therefore disputes arising from breach of the Guaranty cannot be arbitrated." (Pl.'s Opp'n 4.)

---

[5]  The Court agrees that Georgia law governs its determination of whether the arbitration provision contained in the Contract applies to the claims against Werzberger and Friedman. As this is a diversity action in New York state, New York's choice-of-law rules apply. *See Tayyib Bosque, Corp v. Emily Realty, LLC*, 813 F. App'x 628, 629 (2d Cir. 2020) ("[T]he [d]istrict [c]ourt, sitting in diversity jurisdiction, was correct to apply the choice-of-law rules of the forum state — here, New York." (citing *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2013))). Plaintiff is headquartered in Georgia, which provides a reasonable basis for choosing Georgia law. (Compl. ¶ 2.) Accordingly, the Contract's choice of law provision governs. *See Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 F. App'x 562, 564 (2d Cir. 2009) ("Under New York's choice of law rules, it is clear that 'in cases involving a contract with an express choice of law provision . . . a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction,' unless there is fraud, violation of public policy, or no 'reasonable basis for choosing the law of the jurisdiction designated by the parties.'" (quoting *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000))).

Plaintiff further asserts that Defendants are not entitled to the arbitration of claims against Werzberger and Friedman because they are not agents of Silvertown, and even if they were, "the concept that agents of a signatory to a contract with an arbitration clause can take advantage of the arbitration clause applies only where the agents are being sued on the contract along with the principal." (*Id.* at 8.)  Finally, Plaintiff argues that the claims against Friedman based on violations of N.Y. BCL § 1006 and unjust enrichment cannot be subject to arbitration because Georgia law does not provide a basis to arbitrate claims created pursuant to remedial statutes. (*Id.* at 10.)

> **i.  The claims against Werzberger and Friedman are subject to arbitration because they were agents and representatives of Silvertown**

Defendants argue that "the claims against Werzberger and Friedman are . . . arbitrable because the individual defendants were agents and representatives of Silvertown." (Defs.' Mem. 7.)  In support, Defendants argue that Plaintiff conceded in the Complaint that Werzberger was a representative of Silvertown by stating that "each Defendant was the agent, servant and/or employee of each of the remaining Defendants and at all times alleged herein was acting within the course and scope of said agency and/or employment." (Defs.' Reply 7–8 (quoting Compl ¶ 11).)  Defendants further assert that contrary to Plaintiff's interpretation of *Comvest, L.L.C. v. Corp. Sec. Grp., Inc.*, 234 Ga. App. 277, 280 (1998), "so long as a claim is within the scope of the arbitration provision — whether or not the claim is based on the terms of the agreement — the principal's arbitration provision governs the claim against its agents and representatives." (*Id.* at 8.)

Plaintiff argues that "Werzberger is not an agent of Silvertown merely by virtue of being a shareholder." (Pl.'s Opp'n 8.)  Plaintiff interprets *Comvest* to hold that "the concept of an

agent compelling arbitration on the strength of a claim against the principal applies only where the agent is being sued for the same acts as the principal, usually on the theory of *respondeat superior*." (*Id.* at 9.)

"[A] party may be bound by an agreement to arbitrate even in the absence of his signature. . . . Ordinary contract principles determine who is bound by a written arbitration agreement." *Comvest, L.L.C.*, 234 Ga. App. at 280 (alteration in original) (quoting *Valero Refining v. M/T Lauberhorn,* 813 F.2d 60, 64 (5th Cir. 1987)). "Both contract principles and principles of agency law may determine who is bound to an arbitration agreement." *Merrill Lynch v. Landau-Taylor*, 849 S.E.2d 504, 508 (Ga. Ct. App. 2020), *reconsideration denied* (Nov. 18, 2020) (citing *Comvest, L.L.C.*, 234 Ga. App. at 280). "Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." *Comvest, L.L.C.*, 234 Ga. App. at 280 (quoting *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993)); *see also Pritzker*, 7 F.3d at 1121–22 (concluding that although one of the defendants did not sign the contract, because it "was obligated to perform certain services in connection with the [contract]" and its "interests [we]re directly related to, if not predicated upon" the conduct of other defendants' claims, it was also subject to compulsory arbitration"); *Isidor Paiewonsky Assocs., Inc. v. Sharp Props., Inc.,* 998 F.2d 145, 155 (3d Cir. 1993) (noting that arbitration agreements may be upheld against nonparties where the interests of such parties are directly related to those of a signatory); *Arnold v. Arnold Corp.-Printed Commc'ns For Bus.*, 920 F.2d 1269, 1281–82 (6th Cir. 1990) (holding that arbitration clause should be enforced against nonsignatory officers who were deemed agents of the corporation); *Letizia v. Prudential Bache Sec.*, 802 F.2d 1185, 1187–88 (9th Cir. 1986) (holding that statutory claims against nonsignatory brokers were subject

to arbitration agreements). Similarly, a party may be bound by the terms of a contract if he "subsequently ratifies the acts of another in his behalf." *Satisfaction & Serv. Hous., Inc. v. SouthTrust Bank, Inc.*, 283 Ga. App. 711, 712–13 (2007) (quoting Ga. Code Ann. § 10–6–1).

In *Comvest*, the president of a corporation purchased stock units from the defendant–corporation and the defendant–corporation "ratified the contract through its retention of the securities for over one year before bringing suit." *Comvest, L.L.C.*, 234 Ga. App. at 280. Although the president failed to sign a customer agreement, because he had "knowledge of the industry practice requiring the submission of customer/broker disputes to arbitration," the corporation was bound by the arbitration clause. *Id.* In addition, the court found that the employees and representatives of the defendant-corporation who contacted the president to sell the stock were also governed by the arbitration clause. *Id.* The Court interprets *Comvest* to mean that agents and representatives are covered under the terms of a principal's agreements to the extent that the claims against the agents and representatives fall within the scope of the arbitration provision. The Court does not understand *Comvest* to require that the agents and representatives be sued *pursuant* to the terms of the agreement.

Werzberger and Friedman are agents of Silvertown.[6] In addition to Werzberger being the sole owner and president of Silvertown, Plaintiff conceded that for the purpose of this litigation, Werzberger was "the agent, servant and/or employee of" Silvertown and "act[ed] within the course and scope of said agency and/or employment."[7] (Compl ¶ 11.) The claims against

---

[6] Plaintiff does not argue that Friedman is not an agent of Silvertown. (Pl.'s Opp'n 8.)

[7] Although Plaintiff conceded to Werzberger's agency relationship with Silvertown, the Court independently finds that Werzberger is an agent of Silvertown. In Georgia, an agency relationship is created "wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." *Satisfaction &*

Werzberger and Friedman are based on Plaintiff's contractual relationship with Silvertown. *See Ross v. Mathis*, 624 F. Supp. 110, 113–14 (N.D. Ga. 1985), *overruled on other grounds by Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 1000 (11th Cir. 1986) (holding that although the defendant-employee was not a party to an agreement, the claims against him were arbitrable because they arose out of his role as an employee and were based solely on the plaintiff's contractual relationship with his employer). Because the Contract specifies that "[a]ll claims or controversies, or other matters in question, between the parties arising out of or related to the [Contract] or relationship between the parties that are not otherwise settled by agreement of parties will be submitted to and decided by arbitration," (Merchant Appl. 27)[8], Werzberger and Friedman are subject to the arbitration clause.

Accordingly, the Court finds that Plaintiff's claims against Werzberger and Friedman are arbitrable.

---

*Serv. Hous., Inc. v. SouthTrust Bank, Inc.*, 283 Ga. App. 711, 712–13 (2007) (quoting Ga. Code Ann. § 10–6–1). "In order to recover under a theory of apparent or ostensible agency, a plaintiff must establish three elements: (1) that the alleged principal held out another as its agent; (2) that the plaintiff justifiably relied on the care or skill of the alleged agent based upon the alleged principal's representation; and (3) that this justifiable reliance led to the injury." *Butkus v. Putting Greens Int'l Corp.*, 222 Ga. App. 661, 663 (1996) (citing *Richmond County Hosp. Auth. v. Brown,* 257 Ga. 507, 508 (1987)). Werzberger requested the merchant application on behalf of Silvertown and wrote her name as Silvertown's "contact," (Merchant Appl. and Terms of Service ("Merchant Appl.") 1, annexed to Compl. as Ex. 1, Docket Entry No. 1-1), and as Plaintiff notes, the Contract was entered into based on Werzberger's representations that she was the sole owner of Silvertown and that she assumed personal guaranty of the corporation's obligations. (Compl ¶ 6.) As such, the Court finds that Werzberger is an agent of Silvertown.

[8] Because the Exhibit is not consecutively paginated, the Court refers to the page numbers assigned by the electronic case filing system.

11

### ii.  All claims against Werzberger and Friedman are subject to equitable estoppel

Defendants argue that contrary to Plaintiff's assertion, claims made pursuant to remedial statutes, including Plaintiff's N.Y. BCL § 1006(b) claim, are subject to equitable estoppel in Georgia, and equitable estoppel applies in this case.  (Defs.' Mem. 8.)

Plaintiff argues that equitable estoppel "does not apply where a signatory to a contract seeks to apply an arbitration provision from another contract" and Plaintiff "does not rely on any provisions in the [Contract] to assert its claims against Werzberger pursuant to the Guaranty." (Pl.'s Opp'n 6.)  Plaintiff further asserts that "judicial efficiency would not be served by compelling arbitration because, even if the Court were to grant the [m]otion, [the] claims against" John Does and ABC Defendants "would still be litigated" because they do not arise from the Contract.  (*Id.* at 7.)

The doctrine of equitable estoppel permits "a nonsignatory to enforce the provisions of a contract" in two instances: "(1) when the signatory to the contract relies on the terms of the contract to assert his or her claims against the nonsignatory and (2) when the signatory raises allegations of interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1320 (11th Cir. 2013); *see also Arain*, 264 Ga. App. at 759 (stating the two circumstances where Georgia state courts may apply equitable estoppel to allow a nonsignatory to compel arbitration); *Blue Cross & Blue Shield of Ga., Inc. v. DL Inv. Holdings, LLC*, No. 18-CV-1304, 2018 WL 6583882, at *11 (N.D. Ga. Dec. 14, 2018) (citing *Arain*, 264 Ga. App. at 755).

The doctrine of equitable estoppel is grounded in fairness and "precludes a party from claiming the benefits of some of the provisions of a contract while simultaneously attempting to avoid the burdens that some other provisions of the contract impose." *Bailey*, 705 F.3d at 1320

12

(citing *Blinco v. Green Tree Servicing LLC,* 400 F.3d 1308, 1312 (11th Cir. 2005)).  As such, the Georgia Court of Appeals has applied equitable estoppel to cases involving remedial statutes.  *See Arain*, 264 Ga. App. at 761 (compelling arbitration and distinguishing *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971 (11th Cir. 2002), where "plaintiffs . . . made 'no suggestion that the contracts containing arbitration clauses are themselves the product of, or in any way related to, the [defendant's] conspiratorial behavior,' from *Arain*, where "the installment contract [wa]s related to the misconduct alleged by [the plaintiff]" (quoting *In re Humana Inc. Managed Care Litig.*, 285 F.3d at 971)); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000) ("[B]ecause the claims are so intertwined with, and dependent upon, the distribution agreement, its arbitration clause should be given effect.").

"A but-for relationship between the claims and the contract 'alone is not enough to warrant equitable estoppel.'  For a party's claims to rely on a contract, the party must actually depend on the underlying contract to assert the claims."  *Bailey*, 705 F.3d at 1321 (quoting *Lawson v. Life of the S. Ins. Co.,* 648 F.3d 1166, 1174) (11th Cir. 2011)).  That is, "the party claiming estoppel must have relied and acted upon declarations or conduct of the other party."  *Claxton v. Adams*, 849 S.E.2d 494, 499 (Ga. Ct. App. Sept. 21, 2020) (quoting *Tybrisa Co. v. Tybeeland, Inc.*, 220 Ga. 442, 446 (1964)).

As an initial matter, Georgia state does not bar the application of the doctrine of equitable estoppel in cases such as this involving N.Y. BCL § 1006(b).  *See Arain*, 264 Ga. App. at 761 (applying equitable estoppel to claims brought under Georgia's Racketeer Influenced and Corrupt Organizations Act).  Thus, for the reasons discussed above, Plaintiff's claims against Werzberger and Friedman are arbitrable because they are agents and/or representatives of Silvertown.

13

The Court also applies the doctrine of equitable estoppel to compel arbitration for two independent reasons. First, Plaintiff relies on the terms of the Contract to assert its claims against Werzberger and Friedman. Plaintiff's claim against Werzberger for breach of the guaranty is based upon Werzberger's personal guaranty of Silvertown's liability on the Contract; Plaintiff seeks to hold Werzberger and Friedman "liable for Silvertown's liabilities" pursuant to the Contract, (Compl. ¶ 76); and Plaintiff's unjust enrichment claims against Werzberger and Friedman are based upon *all* Defendants' alleged retention of benefits that ensued from the Contract, (*id.* ¶ 88). *See Order Homes, LLC v. Iverson*, 300 Ga. App. 332, 339 (2009) (compelling arbitration against nonsignatories where appellees' claims "all arise under and rely upon [a contract], . . . and the gist of the[] lawsuit concerns the damage . . . suffered as a result of the defective construction of their home, which was the subject matter of the [contract]"). The arbitration clause specifically applies to any claims or controversies arising out of the relationship between Silvertown and Plaintiff, (Merchant Appl. 27), and Werzberger and Friedman are entitled to rely upon the arbitration clause to ensure that any such claims would be arbitrated.

Second, the claims against Silvertown, Werzberger, and Friedman arise out of allegations of interdependent and concerted misconduct. The alleged liability of Silvertown arises only because of the actions of Werzberger and Friedman in the Sham Transactions and vice versa. The allegations of misconduct against the three parties are commingled. (*See e.g.*, Compl. ¶¶ 75–76 ("Prior to its dissolution, Werzberger, Friedman and any other shareholders, directors and/or officers of Silvertown did not adjust Silvertown's affairs pursuant to Article 10 of the [N.Y. BCL]. As a result, any of Silvertown's shareholders, directors and/or officers, including Werzberger and Friedman, may be held liable for Silvertown's liabilities."); *see also Order*

14

*Homes, LLC*, 300 Ga. App. at 339 (holding that there was "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to [a] contract" where the complaint stated that "each defendant had a role in the construction of the home" and resultant conspiracy).

For judicial efficiency and to ensure that "the federal policy in favor of arbitration [is not] effectively thwarted," the Court finds that Werzberger and Friedman can enforce the arbitration clause of the contract. *Arain*, 264 Ga. App. at 761 (compelling arbitration where nonsignatory will "participate in any legal proceeding[] in effect, becoming a party and incurring expense").

Accordingly, the Court also grants Defendants' motion to compel arbitration based on the doctrine of equitable estoppel.[9]

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to compel arbitration.

Dated: February 22, 2021
      Brooklyn, New York

                                       SO ORDERED:

                                            s/ MKB
                                        MARGO K. BRODIE
                                        United States District Judge

---

[9] Because the Court concludes that Plaintiff's claims against Werzberger and Friedman are arbitrable because they were agents and representatives of Silvertown, and in the alternative because the claims are subject to the doctrine of equitable estoppel, the Court declines to address Plaintiff's alternate argument that the Guaranty does not contain an arbitration provision, and therefore disputes arising from breach of the Guaranty cannot be arbitrated.